Statement of the Case.
MONROE, J.
Plaintiff instituted this suit in April, 1907, to recover from defendant certain property interests which he had purchased from J. B. Brown on March 14, 1907, and which Brown had purchased from defendant on October 26, 1903. Defendant filed an exception of no cause of action, which was referred to the merits, after which he set up: First, that plaintiff was endeavoring to enforce litigious rights which he had acquired in violation of a prohibitory law; and then certain other defenses. The case was heard, closed, and submitted, when defendant filed a petition praying that it be re.opened for the purpose of enabling him to introduce newly discovered evidence and, also, for the making of certain corrections in the testimony, as transcribed, and the court made the following order, or ruling:
• “The case is reopened for all purposes. I do not understand, now, that I am trying a mere motion to correct the record, but I am trying the case over again.”
Thereafter it was again submitted, but, a week later, it was again reopened, to allow defendant to make corrections in his testimony, and’ thereupon briefs were filed, and it- was submitted for the third time. On December 16, 1907, the court rendered judgment, reading, in part, as follows:
“The above * * * case having come on * * * first, for hearing upon the exception of no cause of action, and the said exception, after full hearing, having been referred, by the court, to the merits of the controversy, and the case having been regularly set down for trial and fully tried upon the merits, and submitted for determination, and coming on for decision upon the exception of no cause of action and upon the merits, it is, for the oral reasons assigned by the court, and for the written rea-, sons to be placed op file, and the law and the evidence sustaining the position and contention of the defendant in the. exception’of no cause of action, now decreed that the said exception of no cause of action be and is hereby sustained, and it is further * * * decreed that plaintiff’s action be dismissed and rejected, at his cost.”
From the judgment so rendered, plaintiff appéaled to this court, where it was held that “the case was not decided on the merits, and therefore, must be remanded,” and, the judgment appealed from being reversed and the exception overruled, it was “remanded for further proceedings according to law.” Saint v. Martel, 122 Da. 98, 47 South. 415. Counsel for plaintiff then moved to set it down for trial, to which defendant objected; but the court ordered that it be set down for November 17th, on which day defendant moved for a continuance, and the case was continued to November 27th, when, by consent, it was reassigned for December 10th. In the meanwhile, the term of office of the trial judge had expired, and, as his successor had been plaintiff’s attorney, he recused himself and, by consent, appointed the judge of the Twentieth district court to act in his stead. The case was then fixed for February 2, 1909; but on that day the judge ad hoc was informed that the litigants were in the way of effecting a compromise, and he returned to his own district. He was then informed that the compromise had not been effected, and he caused the case to be set down for trial on March 22d when defendant’s counsel objected to its consideration and moved that it be declared “discontinued” on the ground that a compromise had been effected. Counsel for plaintiff moved that defendant’s motion be stricken from the record, and the judge ad hoc referred the issues thus presented to the hearing on the merits and ordered the case to be fixed for April 12th, when defendant prayed for a new trial (of his motion), which prayer, together with an application for an appeal (from the order of reference to the merits), was denied, as was, also, an application to *78 this court for writs of certiorari, prohibition, and mandamus. Saint v. Martel, 123 La. 815, 49 South. 582. Defendant then asked leave to file an amended answer, which was objected to, and allowed, subject to the objection, the judge stating that he would pass upon the question of defendant’s right to file the answer when the case should be again fixed. And the case was again fixed for July 1st, when plaintiff’s objection was sustained, on the grounds:
“First, that it (the supplemental answer offered by defendant) absolutely changed the issues. Secondly, that this case having already been tried, twice, on the merits, there is no good reason or necessity for trying it again; that, in overruling the exception of no cause of action (which had been referred to the merits by the lower court) and remanding the case, it was the very evident intention of the Supreme Court that the case should be decided by the lower court, and not tried again, for the third time, on the merits.”
The learned judge ad hoc then overruled defendant’s motion to “try the case de novo, on the petition, answer, and supplemental answer,” and proceeded to hear testimony on the question of compromise, vel non, after which that question was argued, with the merits, and there was judgment for plaintiff for $15,715.42, less $3,000 paid to J. B. Brown September 4, 1906, with 5 per cent, interest thereon from April 23, 1907, date of judicial demand, until paid; reserving to defendant the right to deduct, in his next settlement with plaintiff, any credits to which he may legally be entitled; rejecting, as in case of nonsuit, plaintiff’s demand for one-tenth of 66.666% shares of. the stock of the Houssiere-•Latreille Oil Company, issued to defendant, after the sale to Brown of the interest here sued for; and condemning defendant to pay all costs.
Other than as stated above, the ease disclosed by the record is as follows: In’ December, 1901, defendant, with D. Caffrey, Sr., and D. Caffrey, Jr., in consideration of services rendered by them, and to be rendered, in legal matters, and particularly in the then pending suit entitled “Corkran Oil & Development Co. v. Laurent Arnaudet et al.,” acquired, from Arnaudet, 'Houssiere, and Latreille, the defendants in that suit, a one-fifth interest in certain tracts of oil-bearing land (in what afterwards became known as the Jennings Oil Field, in the parish of Acadia), in the proportions of one half of said one-fifth (or one-tenth of the whole property) to defendant and the other half to the Messrs. Caffrey. The Corkran Company suit involved the title to the whole property, and there was a good deal of litigation besides, whereby defendant and the Messrs. Caffrey, whom he had associated with him, on behalf of their clients and in their own interest, successfully (as it turned out after several years of litigation) attempted to break certain oil leases, with which the property in question was incumbered, and money was, probably, required for the development of the oil, so that defendant found that he could not, or preferred not, to carry the entire load that he had taken on himself, and he began looking around for assistance. The first person who appears to have come to his aid was a friend by the name of Viguerie, to whom he sold one-fifth of the interest that he had acquired. The next person to whom he applied was J. B. Brown, to whom he sold one-tenth of that interest (that is to say, of the interest as originally acquired by him). Very shortly afterwards, the Houssiere and Latreillé tracts were put into a corporation, called Houssiere-Latreille Oil Company, with a nominal capital of $1,000,000, divided into 1,000,000 shares of $1 each, of which 100,000 shares (or one-tenth of the whole number) were assigned to defendant and a like' number to the Messrs. Caffrey, and they, with the two original owners of the land, constituted the body of the stockholders, held the corporate offices, and managed the corporation. The Arnaudet tract was handled separately, but the interests of the defendant and the Messrs. Caffrey,- in the *80 whole, were managed by them, as a firm, under the name of Caffrey & Martel. The sale to Brown was made on October 26, 1903, by a private act, which describes the property, in part, as follows:
“One-tenth of whatever hope, title or interest * . * *. I have, or may have, in the following suits (giving the titles of a number of lawsuits, including that of the Corkran Company). The aforementioned interest being one-tenth of whatever interest' * * * I have or may have in the Jennings Oil Field, situated ini the parish of Acadia, * * * included in sections 47, 46, 41, 38 and 52. In addition, I bind and obligate myself to give to James B. Brown, the transferee herein, or said vendee, 2,500 shares in the Evangeline Oil Company, Ltd/, presided over by D. Caffrey, Jr., which company has been organized to operate in the aforesaid oil field, which company has the option of eight shares of land in the proved-up field aforesaid.”
As part of the property thus acquired by Brown was one-tenth of defendant’s interest in the Houssiere-Latreille Oil Company, there was issued to him, by defendant’s order, on December 28, 1903, a certificate for 10,000 ■ shares of that stock (full paid and nonassessable), which certificate bears the signature of Donelson Caffrey, president of the company, and of J. Sully Martel (defendant), its secretary. After the sales t to Viguerie and Brown (as before), the firm of Caffrey & Martel continued to manage the entire one-fifth interest which they had acquired in the Arnaudet-Houssiere-Latreille properties, including the oil company, and in the course of time, as oil gushers were “brought in,” that interest increased enormously in value, and Was in a condition to pay large dividends but for the uncertainty as to the ultimate result of the pending litigation, about the title to the land and about the effect of certain oil leases which the owners had made and which, with their associates, they were trying to break. A great deal of money had been taken in, however, and Brown seems to have conceived the idea that he was entitled to some of it, and to have written to defendant on the subject, as we find in the record a letter from defendant to him, of date June 12, 1906, in which the writer says:
“Tour letter was somewhat a surprise to me, after our conversation, which you stated to Caffrey was very satisfactory. All of the oil was on bond, executed by the Caffreys and myself, and, unless you agree to make yourself party principal to this bond, and party defendant in the suits, we can, hardly, give you a settlement, now. If you desire to comply with this, I would be only too glad to give you an accounting; otherwise, you will have to wait until the damage suits and the accounting for the oil for which I stand sponsor are terminated. All dividends will have to be postponed. We hope to be able to terminate all these suits as soon as possible, at which time you will find your share in bank, less the expenses.”
On September 4, 1906, Brown was given a check for $3,000, subject to the following condition, to wit:
“This amount is advanced by J. Sully Martel merely pending the litigation in suits of the Houssiere-Latreille Oil Co. v. Jennings-Heywood Oil Syndicate; J. Sully Martel v. Same; and Jennings-Heywood Oil Syndicate v. Houssiere-Latrefile Oil Co. And. in case it becomes necessary to refund this amount, the payee, James B. Brown, obligates himself to return the same, to meet such liabilities as may, or may have been, incurred therein.”
The quieting effect of this check appears to have lasted about six months, at the end of which time (on March 1, 1906) Brown wrote to defendant saying:
“I wrote you twice lately and am sorry you were not in writing humor to answer now from agreement I am interested with you in the oil interest and am in want of $5000 now on acct. believing what you told me you were going to make me rich I would like to spend some now as you are doing in so far as you are getting rich buying plantations etc. So please send me a check for above amt. that will be easier than writing if I do not hear from you I will be forced to put my claim in Mr. Milling’s hands to find out if possible how I stand with you and your interest hoping you will not force me to act and have trouble.
“Tours, [Signed] J. B. Brown.”
No check appears to have been sent, and somewhat later (March 14, 1907) Brown sold to plaintiff the interest acquired by him from Martel.
This suit, as we have seen, was instituted some five or six weeks after plaintiff’s pur *82 chase, a circumstance which the defendant appears greatly to resent. In his original petition, plaintiff alleges that the property acquired by him includes one-half of the Arnaudet tract, which has produced, and is producing, a great quantity of oil; that defendant has disposed of his (plaintiff’s) share thereof and should be held to account for it; that defendant has received from the sale of said oil (up to the date of the filing of the petition) $152,000, of which petitioner is entitled to $15,000; that petitioner has received from Brown the certificate for 10,000 shares of the stock of the Houssiere-Latreille Oil Company first issued; but that there was a subsequent issue to defendant of 66.666% shares, of which he is entitled to one-tenth. By supplemental petition (filed June 12,1907) he alleges that defendant has received $152,-600, as his share of the profits of the interest handled by Caffrey & Martel. Defendant admits the payment to Brown of the $3,000. He admits that he gave him the 10,-000 shares of stock, but alleges that it was by error, and that the number should have been 8,000. Admits that he sold Brown “one-twentieth of whatever” (interest) he had, at the time, in and to one-fifth interest which he owned in certain lawsuits, enumerated in the “deed attached to plaintiff’s petition,” for $2,500, and the further consideration stated in the deed. And alleges that the said cash consideration was less than half the value of the property sold; that Brown, in violation of his contract, disregarded the other consideration entirely; that he (defendant) owned, at the time, “but eight per cent, of the whole, or entire, interest”; that all the oil sold was bonded out; “that large sums of money are demanded for costs, for reimbursement, for damages,” etc. He prays that plaintiff’s demand be rejected, or, in the alternative, that “only the interest herein above enumerated be decreed to him, as it is clear that defendant could only have sold so much of the interest as he owned, at that time, and none of the interest he acquired subsequently, which was not intended or contemplated at the time of the said transfer.”
Plaintiff, testifying in his own behalf, said that Mr. J. G. Martel, defendant’s- son, and the secretary and manager of the accounting department of the firm of Caffrey & Martel and also of the Houssiere-Latreille Oil Company, had handed him a memorandum showing that defendant was debited, on the books of Caffrey & Martel, with $157,154.20, drawn out as his share of the profits -in that firm, and also showing that a dividend of' 13 per cent, had been declared on the stock of the Houssiere-Latreille Oil Company. The witness admitted that he had not used all of the memorandum handed him by the secretary because he only needed and wanted “to prove rem ipsam — that these amounts of money were used.” The testimony was objected to, and the court ruled that it was admissible only to prove that the statement had been handed to the witness by Martel and not to prove the statement, itself, or the truthfulness of the same. Subsequently Mr. J. G. Martel, the secretary, etc., testified that the $157,154.20, appearing on the statement, correctly represented the balance debited to defendant on the books of Caffrey & Martel, but that, upon the memorandum which he had handed plaintiff, there were two credit items also taken from those books. He also stated that the memorandum showed that dividends amounting to 13 per cent, had been declared on the stock of the Houssiere-Latreille Oil Company. Being asked to explain about the dividend, he said:
“A. Why the association, of Messrs. Caffrey and Martel and Messrs. Houssiere and Latreille, and the rights of that property, during the pendency of this suit — certain amounts were advanced the company by the_ officers of the company and Messrs. Houssiere and Latreille; there was a suit pending in the Supreme Court, at the time, and they were fearful that, if the decision was rendered against the company, these amounts of Mr. John M. Caffrey, the manager of the company, that they would be held liable for the same, and the others were much *84 of the same opinion, so they requested that a meeting of the board of directors be held, and that these amounts be declared as dividends, in order that they might be protected in case the suit was decided against them, the company, so this was done, and that is the dividend transaction.”
The witness was asked, whether the company was then in a condition to declare a dividend, ■ and he answered (over plaintiff’s objection) that it was not. The witness was on the stand several times, and the amplest opportunity was afforded to either of the litigants, who might have been curious to know, to find out of what the two items of credit, to which he had referred, consisted, but no questions were asked on that subject. The defendant asked the question and received the answer following, to wit:
“Q. Mr. Martel, you have shown here by a statement that you have debited my account with a certain sum. Where did Caffrey & Martel derive the money from which these amounts have been advanced to them? A. Out of the proceeds of the oil produced from the Arnaudet tract, and the bulk of the oil is now involved in the accounting suit, which is now pending in the same court. This oil was bonded out by Messrs. Caffrey & Martel and D. Caffrey, Jr., and J. Sully Martel, rendering themselves personally liable on these bonds. This amount, that you speak of having been debited upon your account, is merely an amount advanced to you, and you are charged with it upon the corporation books, just like the ordinary debtor, for the reason that no profits have yet been declared by the firm of Caffrey & Martel, and they will not declare any until the litigation is completed.”
He said that, if the firm were to declare a dividend, it would amount to about $750,000, but that the bonds given by D. Caffrey, Jr., and defendant, for the release of oil sold by the firm, amount to $816,000.
Concerning the compromise, we find the facts to be as follows: When the judge ad hoc opened court on February 2, 1909, prepared to dispose of this case, he was informed that there was a prospect of a compromise, and he allowed the case to go over. The movement to effect the compromise' seems to have been initiated, and carried on so far as it went, largely through the efforts of D. Caffrey, Jr., who, with the estate of D. Caffrey, Sr., has an interest in plaintiff’s claim, and who discussed the matter with defendant, or his attorney, or both, and with plaintiff. The matter was under discussion during February 2d, 3d, and 4th, and a conclusion was reached on the day last mentioned, in the evening, in Caffrey’s office. On that evening there were assembled D. Caffrey, Jr., plaintiff, defendant’s attorney, and defendant’s son-in-law, Mr. Block, and they had, by that time, reduced the contemplated agreement to writing, in triplicate, and, after considerable discussion, the triplicates were signed by Saint, with the understanding that the others would sign as soon as practicable, and that the agreement should take effect from the date of the instrument, to wit, February 4, 1909.
There is some rather conflicting testimony in the case; but, as the matters to which it relates are, in the main immaterial to the issues to be decided, we pretermit its consideration. It is undisputed that Saint signed the proposed agreement, as above stated, on the evening of February 4th; that Viguerie signed the next day (February 5th); that Martel and Block went, that afternoon, together, by rail, to Jennings, where Block, at Martel’s request, presented the triplicates to John M. Caffrey, and asked him to sign them, for himself and for the estate of D. Caffrey, Sr., which he did, on the following morning; that Martel and Block remained in Jennings until the morning of February 6th, when Martel went, by an early train, to Crowley; that Block followed on a later train, and was joined, at Crowley, by Martel, who rode with him as far as Franklin, at which point he got off; that Block went on to New Orleans, in order to obtain the signature of D. Caffrey, Jr., arriving there the same day, Saturday, February 6th; that Martel arrived in New Orleans that evening with his family, and took his son, who was sick, to a sanatorium; *86 that D. Caffrey, Jr., refused tu sign the-papers, because he did not consider himself a party to the contract; that Block left the papers with Mrs. Martel and returned to Franklin, on Monday, the 8th. Martel testifies that he remained in New Orleans until February 25th, much concerned about his son, who became critically ill, and his testimony is strongly corroborated as to a portion of the time. A very credible witness, however, says that he spoke to him, in Franklin, through the telephone, on or about the 20th. He himself says that on the 18th his son had improved in health and urged them (himself and the other members of the family) to attend the Momus hall; that he took his son out in a carriage on the 19th; that he and some members of his family attended the automobile races on the 20th; that on the 22d, in New Orleans, he and Caffrey had a settlement of the affairs of the firm of Caffrey & Martel; that on the 25th he returned to Franklin; and that, on the morning of the 26th, he signed the written agreement, the triplicates of which he, or his wife, had had' from the time that Block left them, on Monday, the 8th. He gives no other reason for ■not having signed before than that he was anxious about his son. On February 26th plaintiff addressed a letter to defendant as follows:
“Dear Sir: This is to inform you that the time limit for our oil matters and the suit pending for the recovery of certain oil interests in the Jennings Field according to agreement of date Feb. 4, 1909, has expired and no settlement has been had. I take this method of notifying you that if you do not make the settlement,, as agreed upon, by six o’clock of this day, the agreement will be at an end!”
' To the letter thus written, he received a reply, from defendant’s legal adviser, informing him that defendant had gone to New Orleans to bring his son home, and would be back next day. Saying also:
“I have the honor to inform you that, even under the agreement, the time limit has not expired, although time was not of the essence of said agreement, and we deny,' in toto, your proposed attempt to put an end to the agreement. We now notify you that we will hold you to its terms.”
After the foregoing correspondence, there were some conversations between plaintiff and defendant’s counsel and an unsuccessful attempt, on the part of the latter to bring about a business interview; but plaintiff testifies that he did not care to have such a meeting, and purposely avoided it On the evening of February 27th, defendant’s counsel sent plaintiff a statement of the settlement which had been made of the affairs of Caffrey & Martel, and another, of the proposed settlement to be made with him, showing a net cash balance due to plaintiff of $19,749.70, as also certain charges and deductions, which plaintiff, through his counsel, utterly repudiates. And on March 1st plaintiff received a letter informing him of defendant’s readiness to settle upon the basis of said statement.
Opinion.
On the Question of Reopening the Case.
After the trial judge had referred the exception of “no cause of action” to the merits, and had then heard all the testimony on the merits - that the litigants chose to offer, and had opened the case twice, after it had been submitted, and had finally taken it under advisement on briefs filed by both counsel, it is difficult to understand what he should have done save to dispose of it by a final judgment. " If he had overruled the exception, he would hardly have been expected, undér such circumstances, to have set the case down for hearing' again, and we can see no reason why it should have been so set down because the exception was overruled by this court, rather than- by the trial court, since the parties had had their day in court for the purposes of the:hearlng, and the judge ad hoc was in quite as good a position to give judgment as this court now *88 is. Beyond that, when this court reversed the judgment of the trial court, and overruled the exception, it said “the case was not decided on the merits, and therefore must be remanded,” and it was “remanded for further proceedings according to law.” Saint v. Martel, 122 La. 98, 47 South. 415. It was remanded, not because it had not been heard on the merits,'but because it had not been decided on the merits, and the judge a quo correctly interpreted the opinion and decree, in holding that “further proceeding according to law” called for a judgment and not for reopening of a case that had already been heard and submitted and reopened twice, and finally submitted. Moreover, in the absence of specific ruling or instruction from this court to the contrary, the law requires that a case so' situated should be dealt with as the judge ad hoe dealt with this case. Act No. 94 of 1898, § 3.
The suggestion, made for the first time in the oral argument in this court, that the statute thus cited is unconstitutional, cannot be entertained. Defendant had the opportunity to raise the question in the district court, and, having failed to do so, cannot be heard to raise it here. Murphy v. Police Jury, 118 La. 401, 42 South. 979; Miller v. Thorpe, 4 Colo. App. 559, 36 Pac. 891; Curtwright v. Crow, 44 Mo. App. 563; Tompkins v. Augusta & K. R. Co., 21 S. C. 420; Chiniquy v. People, 78 Ill. 570; Hopper v. Chicago, M. & St. P. R. Co., 91 Iowa, 639, 60 N. W. 487; Delaney v. Brett, 51 N. Y. 78; Elliott v. Oliver, 22 Or. 44, 29 Pac. 1; Bomar v. Asheville & S. R. Co., 30 S. C. 450, 9 S. E. 512; Gagnet v. City, 23 La. Ann. 207.